898 F.2d 339
 22 Collier Bankr.Cas.2d 908, Bankr. L. Rep. P 73,316
DECATUR CONTRACTING d/b/a Hoffman Construction Company, Inc.
v.
BELIN, BELIN & NADDEO, a partnership, Glen Irvan Corp.
M.A.W.G., Inc., t/a C.A.M., Co., Erie Bearings Company,
Place Electric Supply, Inc., Brumbaugh Insurance Group,
United States of America (Internal Revenue Service),
Commonwealth of Pennsylvania (Department of Labor &
Industry) and Commonwealth of Pennsylvania (Department of
Revenue), Central Bank.
Appeal of CENTRAL BANK.
DECATUR CONTRACTING d/b/a Hoffman Construction Company, Inc.
v.
BELIN, BELIN & NADDEO, a partnership, Glen Irvan Corp.
M.A.W.F., Inc., t/a C.A.M., Co., Erie Bearings Company,
Place Electric Supply, Inc., Brumbaugh Insurance Group,
United States of America (Internal Revenue Service),
Commonwealth of Pennsylvania (Department of Labor &
Industry) and Commonwealth of Pennsylvania (Department of
Revenue) James R. Huff, II, Trustee, Appellant.
 Nos. 89-3566 to 89-3568, 89-3590.
 United States Court of Appeals,
Third Circuit.
 Submitted Under Third Circuit Rule 12(6)
 Jan. 17, 1990.
Decided March 6, 1990.
As Amended May 31, 1990.
 
 James R. Walsh, Spence, Custer, Saylor, Wolfe & Rose, Johnstown, Pa. and Gary W. Short, Pittsburgh, Pa., for appellants.
 Laverne M. Kovacs, Levine, Reese & Serbin, Altoona, Pa., Eugene J. Brew, Jr., McClure & Miller, Erie, Pa., Thomas M. Kalinyak, Johnstown, Pa., and Deborah C. Phillips, Com. of Pa. Dept. of Labor and Industry, Pittsburgh, Pa., for appellees.
 Before BECKER, GREENBERG and NYGAARD, Circuit Judges.
 OPINION OF THE COURT
 NYGAARD, Circuit Judge.
 
 
 1
 In this bankruptcy matter, James R. Huff, II, (Trustee) and Central Bank, a judgment creditor of Decatur Contracting d/b/a Hoffman Construction Company, Inc. (Decatur), appealed to the district court from an order of the bankruptcy court which (a) permitted the Trustee to avoid Central Bank's judicial lien on a money judgment obtained by Decatur before bankruptcy; and, (b) refused the Trustee's request to avoid several partial transfers of the same judgment to appellees M.A.W.G., Inc., t/a C.A.M. Co. (C.A.M. Co.), Erie Bearings Company, Place Electric Supply, Inc., and Brumbaugh Insurance Group. The district court affirmed the bankruptcy court and both the Trustee and Central Bank appeal. We will reverse.I.
 
 Stipulated Facts
 
 2
 On March 4, 1985, Decatur confessed judgment against Glen Irvan Corporation (Irvan) in the amount of $168,560.36 plus interest. Irvan filed a petition to open or strike the judgment which was denied by the Common Pleas Court of Clearfield County on October 2, 1985. On October 16, 1985, Decatur served a writ of execution and interrogatories on Summit Bank, which held Irvan's funds. On October 21, 1985, Irvan filed a notice of appeal with the Superior Court of Pennsylvania. On November 27, 1985, the common pleas court directed Irvan to post a supersedeas bond in the amount of $215,941.12. On December 9, 1985, Irvan obtained a Certificate of Deposit (CD), payable to the Commonwealth of Pennsylvania, from Summit Bank, which delivered the CD to the Prothonotary of Clearfield County, Pennsylvania. This security operated as a supersedeas of Decatur's writ of execution. Pa.R.App.P. 1735.
 
 
 3
 On March 10, 1986, the first CD matured and Summit Bank issued an identical one in its place and delivered it to the Prothonotary.
 
 
 4
 On April 4, 1986, Decatur made two partial assignments of its judgment against Irvan without obtaining Irvan's consent. It assigned $71,806.04 to C.A.M. Co. and $49,736.54 to Erie Bearings Company. Both assignments were docketed by the Prothonotary on April 11, 1986.
 
 
 5
 On May 2, 1986, the Superior Court of Pennsylvania dismissed Irvan's appeal. On May 23, 1986, it denied Irvan's petition to reopen the appeal.
 
 
 6
 On June 2, 1986, Decatur assigned $27,042.82 of its judgment against Irvan to Place Electric Supply, Inc., again without Irvan's consent.
 
 
 7
 On June 9, 1986, the second CD matured and Summit Bank issued an identical one in its place and delivered it to the Prothonotary.
 
 
 8
 On June 10, 1986, the common pleas court dissolved the supersedeas. The order, which indicates that Irvan consented, directs the Prothonotary "to transmit to Carl A. Belin, Jr., as attorney for the judgment creditor [Decatur] and assignee of judgments, the sum of $190,144.52." App. at 24. This money was not transmitted.
 
 
 9
 On June 11, 1986, Decatur assigned $30,000 of its judgment against Irvan to Brumbaugh Insurance Group, again without Irvan's consent.
 
 
 10
 On June 12, Central Bank obtained a $236,104.52 judgment by confession against Decatur in the common pleas court.
 
 
 11
 On June 13, 1986, Irvan filed a Petition for Allowance of Appeal with the Pennsylvania Supreme Court.
 
 
 12
 On June 17, 1986, the Prothonotary docketed the partial assignments of Place Electric Supply, Inc. and Brumbaugh Insurance Company.
 
 
 13
 On June 18, 1986, Central Bank caused a writ of execution and interrogatories to be served upon Carl Belin, as garnishee, because he was authorized to receive the $190,144.52 from the Prothonotary in satisfaction of Decatur's judgment against Irvan.
 
 
 14
 On September 8, 1986, the third CD matured and Summit Bank issued an identical one in its place. This CD was not delivered to the Prothonotary as the previous CD's had been; rather, Summit Bank retained it.
 
 
 15
 On September 16, 1986, Central Bank caused a writ of execution and interrogatories to be served on Summit Bank as garnishee.
 
 
 16
 On September 24, 1986, Summit Bank mailed the September 8th CD to Belin. Belin had the Prothonotary endorse the CD on September 26, 1986 and returned it to Summit Bank the same day. On September 30, 1986, Summit Bank wired $196,130.34 to Belin to be held in escrow pending the outcome of Irvan's appeal to the Pennsylvania Supreme Court.
 
 
 17
 On November 21, 1986, the Pennsylvania Supreme Court denied Irvan's appeal.
 
 
 18
 On December 24, 1986, Decatur filed a voluntary petition for bankruptcy under Chapter 11 of the Bankruptcy Code, 11 U.S.C. Secs. 1101-1146. The Chapter 11 proceeding was later converted to a Chapter 7 proceeding and James R. Huff, II, was appointed Trustee.
 
 
 19
 On May 27, 1987, the Trustee filed a complaint in the bankruptcy court seeking to avoid the assignments and Central Bank's garnishment. As to the partial assignments, the Trustee claimed that they were void because Irvan did not consent to the assignments, and that they were avoidable preferences. The Trustee further claimed that any lien acquired by Central Bank's garnishment was also an avoidable preference.
 
 II.
 
 20
 The facts underlying this appeal are not in dispute. The parties raise only questions of law, thus this court's scope of review is plenary. Matter of Jersey City Medical Center, 817 F.2d 1055, 1059 (3d Cir.1987); Universal Minerals, Inc. v. C.A. Hughes & Co., 669 F.2d 98, 101-102 (3d Cir.1981). Although the Trustee's ability to avoid the parties' liens is controlled by the federal bankruptcy law, the court must look to Pennsylvania law to determine what, if any, property interest the parties hold in the debtor's estate. Cf. Matter of Bollinger Corp., 614 F.2d 924, 925 n. 1 (3d Cir.1980).
 
 III.
 Central Bank's Garnishment Lien
 
 21
 The bankruptcy court decided that Central Bank's garnishment lien became perfected on the date on which the 90 day preference period began, and hence, was avoidable because the funds were in custodia legis until at least September 26, 1986, within the 90 day preference period, and the lien could not be perfected until the funds were out of the custodia legis. The district court affirmed. We believe both misapplied state law and will reverse.
 
 
 22
 The Trustee relies upon 11 U.S.C. Sec. 547(b)(4)(A) to avoid Central Bank's lien. Section 547(b)(4)(A) provides, "Except as provided in subsection (c) of this section, the trustee may avoid any transfer of property of the debtor ... (4) made--(A) on or within 90 days before the date of the filing of the petition." The question then is whether Central Bank's lien is a transfer of Decatur's property made within 90 days of December 24, 1986 (or on or after September 26, 1986).
 
 
 23
 11 U.S.C. Sec. 547(e)(2) defines when a transfer is made:
 
 
 24
 For the purposes of this section, except as provided in paragraph (3) of this subsection, a transfer is made--
 
 
 25
 (A) at the time such transfer takes effect between the transferor and the transferee, if such transfer is perfected at, or within 10 days after, such time;
 
 
 26
 (B) at the time such transfer is perfected, if such transfer is perfected after such 10 days.... (emphasis added)
 
 
 27
 A transfer is not made, however, until the debtor has acquired rights in the property transferred. 11 U.S.C. Sec. 547(e)(3). 11 U.S.C. Sec. 547(e)(1)(B) defines when a transfer is perfected:
 
 
 28
 For purposes of this section--
 
 
 29
 . . . . .
 
 
 30
 (B) a transfer of a fixture or property other than real property is perfected when a creditor on a simple contract cannot acquire a judicial lien that is superior to the interest of the transferee.
 
 
 31
 The first question, then, is when Decatur acquired property rights by its judgment against Irvan.
 
 A.
 Decatur's Judgment Against Irvan
 
 32
 Under Pennsylvania law, the lien of a judgment creditor attaches to a judgment debtor's personal property in the possession of a third party when a writ of execution is served upon that third party, (known as a garnishee). Pa.R.Civ.P. 3111(b); Helms v. Chandler, 423 Pa. 77, 223 A.2d 30 (1966); Dietrich Industries, Inc. v. Abrams, 309 Pa.Super. 202, 455 A.2d 119 (1982). A garnishee can be any person in possession of the judgment debtor's property. Pa.R.Civ.P. 3101(b). Here, Decatur held a judgment against Irvan, and, on October 16, 1985, Decatur served a writ of execution on Summit Bank, which possessed funds of Irvan. Under Pennsylvania law, Decatur's judgment lien attached to those funds at that time. That Irvan filed a motion to strike or open the judgment does not affect the status of the lien. Pa.R.Civ.P. 2959(f); Macioce v. Glinatsis, 361 Pa.Super. 222, 522 A.2d 94, 96 (1987). A judgment lien constitutes a liquidated claim, and is property of the judgment creditor. In re Upset Sale, Tax Claim Bureau of Berks County, 505 Pa. 327, 479 A.2d 940, 943-44 (1984). Under Pennsylvania law, Decatur had property rights when it executed on its judgment against Irvan on October 16, 1985, well before the 90 day preference period and well before any transfer. Now we must determine when a Section 547(e)(2) transfer of this property was made which requires us to examine when Central Bank's lien attached and became perfected.
 
 B.
 Central Bank's Judgment Lien
 
 33
 Pennsylvania Rule of Civil Procedure 3111(b) provides:
 
 
 34
 Service of the writ upon the garnishee shall attach all property of the defendant which may be attached under these rules which is in the possession of the garnishee. It shall also attach all property of the defendant which may be attached under these rules and which comes into the garnishee's possession thereafter until judgment against him even though no such property of the defendant was in his possession at the time of service. (emphasis added)
 
 
 35
 "Possession" is defined in Pennsylvania Rule of Civil Procedure 3101(b),
 
 
 36
 Any person may be a garnishee and shall be deemed to have possession of property of the defendant if he
 
 
 37
 . . . . .
 
 
 38
 (2) has property of the defendant in his custody, possession or control;
 
 
 39
 (3) holds as fiduciary property in which the defendant has an interest; ....
 
 
 40
 On June 12, 1986, Central Bank confessed judgment against Decatur for $236,104.52. On June 18, 1986, Central Bank served a writ of execution and interrogatories upon Carl Belin, Decatur's attorney, as garnishee. The question here is whether Belin had "property" of the defendant[1] in his custody, possession or control or held such property as a fiduciary when served with the writ.
 
 1.
 Custodia Legis[2]
 
 41
 The bankruptcy court held that Central Bank could not obtain a perfected lien because the funds were in custodia legis when Central Bank served its writ upon Belin. We conclude that, although the status of the property in the possession of the Prothonotary does have a place in our analysis, custodia legis does not apply because the garnishee, Belin, was neither the Commonwealth nor a public official.
 
 
 42
 Custodia legis operates only to immunize the Commonwealth and its public officials from the attachment proceedings. Custodia legis does not apply to prevent attachment of a fund held by the Commonwealth or one of its officers if that fund can be attached through a non-public garnishee, such as Belin. Accord, Ostroff v. Yaslyk, 204 Pa.Super. 66, 203 A.2d 347 (1964) (Custodia legis held not to apply where a non-public entity was served with the writ of execution and had possession of defendant's funds, even though the Commonwealth was a prospective custodian of the fund.), rev'd on other grounds, 419 Pa. 183, 213 A.2d 272 (1965). We conclude that the bankruptcy court erred by concluding that custodia legis prevented the writ of execution from attaching the proceeds of Decatur's judgment, because Belin is a non-public officer and property in his possession is not insulated by this doctrine.
 
 
 43
 Although custodia legis may not operate to bar attachment because the writ was served on a non-public officer, the Prothonotary's physical possession of the CD may bar attachment if the CD was not in Belin's "possession," as defined by Pa.R.Civ.P. 3101(b). So, we must determine whether Belin or the Prothonotary "possessed" the property at the time Central Bank served its writ on Belin. Until June 10, 1986, the Prothonotary held the property to the exclusion of all others, even Decatur. See, Pa.R.App.P. 1735 (supersedeas acts to stay execution); Marine National Bank v. Northwest Pennsylvania Bank, 308 Pa.Super. 154, 454 A.2d 67 (1982) (property which has been attached is in custodia legis and is therefore immune from execution by all except for attaching creditor). On June 10, 1986, however, the common pleas court dissolved the supersedeas, and ordered the Prothonotary to turn the funds over to Decatur's attorney. The Prothonotary no longer held the property to the exclusion of Decatur. The June 10, 1986 order gave Belin control over the property. He could have immediately gone to the Prothonotary, presented the court's order and demanded that the Prothonotary turn over the money to him. Thus, under Rule 3101(b), Belin "possessed" the property at the time the writ was served.
 
 
 44
 The Trustee relies upon Brunswick Corp. v. Ciaffoni, 432 Pa. 442, 248 A.2d 39 (1968), cert. denied, 394 U.S. 997, 89 S.Ct. 1594, 22 L.Ed.2d 776 (1969), to support his argument that Central Bank could not obtain a garnishment lien on the judgment because the CD remained in custodia legis until the Prothonotary actually gave the CD to Belin. The Trustee cites the following language as controlling, "Ordinary common sense requires that custodia legis continues until the order ... could be effected. Otherwise the order ... would be meaningless." Id. at 41, 248 A.2d 39. We do not find Brunswick controlling.
 
 
 45
 A majority of the justices in Brunswick did not adopt the language relied upon by the Trustee. "Under Pennsylvania law, an opinion joined by fewer than a majority of the justices on the Commonwealth's Supreme Court is not a binding or controlling precedent." Vargus v. Pitman Manufacturing Co., 675 F.2d 73, 74 (3d Cir.1982). Thus, without an authoritative announcement, we still must predict how the Pennsylvania Supreme Court would rule on this issue. Erie Castings Co. v. Grinding Supply, Inc., 736 F.2d 99 (3d Cir.1984).
 
 
 46
 We do not think that the Pennsylvania Supreme Court, when faced with the facts of this case, would conclude that Brunswick controls or commands the result sought by the Trustee. First, as explained above, we do not think custodia legis applies to the situation as neither the Commonwealth nor a public officer were served as garnishees. Second, the reasoning behind the rule in Brunswick does not exist in this case and we think the Pennsylvania Supreme Court would not extend Brunswick here.
 
 
 47
 In Brunswick, McDonald Corporation, owners of a bowling alley, went bankrupt. At dispute was who would get the bowling equipment purchased by McDonald from Brunswick Corporation. The referee ordered the receiver of McDonald to turn over the bowling equipment to Brunswick. After this order, but before Brunswick could remove the equipment, the landlord of the building leased by McDonald, distrained the equipment for rent. The plurality opinion reasoned that the landlord could not distrain the equipment because the equipment was subject to custodia legis until the referee's order could be effected, and because the landlord's action, if allowed, would render the referee's order a nullity.[3]
 
 
 48
 The case before us is very different. Central Bank's garnishment of the judgment by serving Belin does not render the court's order meaningless. Thus, there is no need to use custodia legis to protect the vitality of the court's order. We think the Pennsylvania Supreme Court would not apply the reasoning of the plurality in Brunswick to this case.
 
 2.
 Validity of the June 10 Order
 
 49
 The Trustee argues that the June 10 order is void because the common pleas court did not have jurisdiction over the case after appeal. The Trustee argues that because Rule 1701 only states that the court has the authority to grant supersedeas, it does not follow that it also has authority to dissolve supersedeas. We disagree.
 
 
 50
 As of May 23, 1986, when the Pennsylvania Superior Court denied Irvan's petition to reopen his appeal, no appeal was pending. The trial court then regained jurisdiction over the subject matter. Bartle v. Bartle, 304 Pa.Super. 348, 450 A.2d 715 (1982); see, also, Chervenak, Keane & Co., Inc. v. Hotel Rittenhouse Assoc., Inc., 328 Pa.Super. 365, 477 A.2d 487 (1984). On June 10, the trial court had jurisdiction to dissolve the supersedeas without Rule 1701.[4]
 
 3.
 Irvan's Petition for Allocatur
 
 51
 The remaining question is what effect did Irvan's June 13 Petition for Leave to Appeal to the Pennsylvania Supreme Court have on the funds released by the June 10 order. We conclude that it had none. Rule 1731 provides,
 
 
 52
 [A]n appeal from an order involving solely the payment of money shall, unless otherwise ordered pursuant to this subchapter, operate as a supersedeas upon the filing with the clerk of appropriate security in the amount of 120% of the amount found due by the lower court and remaining unpaid.
 
 
 53
 The record does not show that Irvan filed any security after filing his Petition for Leave to Appeal to the Pennsylvania Supreme Court.[5] We conclude that Irvan had no supersedeas on the writ of execution filed by Decatur on October 16, 1985 while Irvan's petition was pending with the Pennsylvania Supreme Court.[6]
 
 
 54
 Since Belin had "possession" of Decatur's money when the writ was served, the money was attached at that time. Central Bank had a perfected judgment lien on Decatur's property on June 18, 1986. This lien would be superior to all subsequent judgment liens obtained against the property by a creditor under a simple contract. Pa.R.Civ.P. 3111(c); see, 11 U.S.C. Sec. 547(e)(1)(B).[7] Under the Bankruptcy Code,[8] the transfer occurred on June 18, 1986, more than 90 days before the petition in bankruptcy. It is not a preferential and avoidable transfer.[9]
 
 IV.
 Partial Assignments
 
 55
 The bankruptcy court denied the Trustee's attempt to avoid Decatur's partial assignments. The bankruptcy court first held that a judgment debtor's consent to a partial assignment of the judgment was not necessary for the partial assignment to be valid when the rationale for requiring consent--to prevent the judgment debtor from being subject to the harassment and expense of uncontemplated multiple lawsuits--would not be served. The bankruptcy court then held that Decatur's partial assignments fell within its rule. The bankruptcy court reasoned that the bond posted by Irvan covered any amounts assigned, and, Irvan would not be subject to harassment because affirmance by the Pennsylvania Supreme Court would give the assignees a partial claim to the judgment only against Decatur, reversal would give them no claim against Irvan because there would be no judgment. The bankruptcy court concluded that the "transfers" were made before the 90 day preference period and, as such, were not avoidable by the Trustee.
 
 
 56
 The district court affirmed the bankruptcy court's result on different grounds. It held that the judgment debtor's consent was not necessary to make a partial assignment valid as between the assignor and assignee, and concluded that the Trustee could not avoid the partial assignments. We disagree with the reasoning of both and will reverse.
 
 A.
 The Bankruptcy Court
 
 57
 The bankruptcy court erred by concluding that the partial assignments would not subject Irvan to multiple lawsuits. The result of Irvan's appeal would not be limited to either an affirmance giving the partial assignees a right only against Decatur, or a reversal dissolving the rights of the partial assignees. Decatur had obtained a judgment by confession against Irvan. Under Pennsylvania law, relief from a judgment by confession is given by either striking or opening the judgment. Pa.R.Civ.P. 2959. To the extent a motion to strike is granted, only the stricken judgment ceases to exist, the underlying claim survives to be pursued. See, e.g., Industrial Valley Bank v. Glossbrenner, 297 Pa.Super. 332, 443 A.2d 1148 (1982). To the extent a motion to open judgment is granted, the judgment which is opened remains effective but the issues opened become available for trial. See, Pa.R.Civ.P. 2960; see, e.g., Becker v. Schoettle, 277 Pa.Super. 129, 419 A.2d 695 (1980). Thus, the possibility exists that Irvan could be subject to multiple lawsuits. The need for requiring a judgment debtor to consent to a partial assignment of a judgment against it to make that partial assignment valid exists in this case.
 
 B.
 The District Court
 
 58
 The district court erred by concluding that under Pennsylvania law, the assignor of a judgment does not "retain the power to invalidate its own partial assignment." In Geist's Appeal, 104 Pa. 351 (1883), the Pennsylvania Supreme Court held that partial assignees of a claim against a municipality could not enforce their assignments against the subsequent general assignee of the claim who collected it because the partial assignees had no lien. The court reasoned,
 
 
 59
 The partial assignments to the appellees were at most an agreement to pay them out of the fund. It was said by Mr. Justice Swayze in Christmas v. Russell 14 Wallace 70: "An agreement to pay out of a particular fund, however clear in its terms, is not an equitable assignment.... The assignor must not retain any control over the fund; any authority to collect it, or any power of revocation; if he does it is fatal to the claim of the assignee. The transfer must be of such a character that the fund holder can safely pay, and is compelled to do so though forbidden by the assignor."
 
 
 60
 Id. at 355.
 
 
 61
 The Pennsylvania law is further explained in Gordon v. Hartford Sterling Co., 319 Pa. 174, 179 A. 234 (1935).[10] In Gordon the Pennsylvania Supreme Court held that a receiver of an assignor could avoid a partial assignment of a claim against an insurance company where the insurance company did not consent to the partial assignment. Reviewing Pennsylvania law, the court concluded, "where an assignor assigns a part of his claim, he is still the principal creditor and retains control of the claim unless the debtor accepts the assignee as a new creditor to the amount of the assignment." Gordon, 179 A. at 236. The court then concluded that the receiver had the same rights as the assignor against the insurance company, and, despite the partial assignment, could later compromise the debtor's claim against the insurance company.
 
 
 62
 Decatur made only partial assignments of its claim against Irvan to Erie Bearings Company, Place Electric Supply, Inc., C.A.M. Co. and Brumbaugh Insurance Group. Irvan did not consent to these transfers when they were made, when they were recorded, or at any time thereafter. Under Geist and Gordon, Decatur retained power dispose of its claim against Irvan in any manner it chose. Thus, Decatur could have assigned the whole claim to a party who would then have a judicial lien superior to the assignees. See, e.g., Geist's Appeal, 104 Pa. 351 (1883). Therefore, under Section 547(e)(1)(B) we conclude that the partial assignments were not perfected at the time they were made nor when they were subsequently recorded.
 
 
 63
 Finally, we conclude the assignees never perfected their transfers at any time before the 90 day preference period, because Irvan did not consent to the assignments before the period began, see, e.g., In re Boyd's Estate, 394 Pa. 225, 146 A.2d 816 (1958). We hold that the partial assignments are avoidable by the trustee.
 
 V.
 
 64
 Accordingly, we will reverse the orders of the district court in these combined appeals and remand the matter to the bankruptcy court to administer the bankrupt estate in a manner consistent with this opinion.
 
 
 
 [1]
 Decatur's judicial lien on the money held by Summit Bank is a property right
 
 
 [2]
 Custodia legis is a doctrine which provides that "funds in the hands of the Commonwealth or its political subdivisions, owing to individuals, are not attachable since the public policy holds that the government should be free from the annoyance and uncertainty arising out of disputes between the individual to whom the money is owed and those claiming a right therein by garnishment." Wheatcroft v. Smith, 239 Pa.Super. 27, 362 A.2d 416, 418 (1976); see also, Weicht v. Automobile Banking Corp., 354 Pa. 433, 47 A.2d 705 (1946); Ramins v. Chemical Decontamination Corp., 560 A.2d 836 (Pa.Cmwlth.1989); Security Bank and Trust Co. v. Rollin, Inc., 348 Pa.Super. 328, 502 A.2d 232 (1985); Commonwealth v. Collingdale Millwork Co., 71 Pa.Cmwlth. 286, 454 A.2d 1176 (1983); Commonwealth v. Myers, 298 Pa.Super. 272, 444 A.2d 1170 (1982); Buchholz v. Cam, 288 Pa.Super. 33, 430 A.2d 1199 (1981). In all of these cases, the Commonwealth or a public officer of the Commonwealth was the garnishee
 
 
 [3]
 Only two justices subscribed to this interpretation
 
 
 [4]
 Even if the appeal was still pending, the trial court arguably could have dissolved the supersedeas. Pennsylvania Rule of Appellate Procedure 1701 provides, in pertinent part,
 (a) General rule. Except as otherwise prescribed by these rules, after an appeal is taken ..., the trial court ... may no longer proceed further in the matter.
 (b) Authority of a trial court or agency after appeal. After an appeal is taken ..., the trial court ... may:
 (1) Take such action as may be necessary to preserve the status quo, ..., grant supersedeas, and take other action permitted or required by these rules or otherwise ancillary to the appeal....
 Pennsylvania Rule of Appellate Procedure 1732(a) provides,
 (a) Application to lower court. Application ... for approval of or modification of the terms of any supersedeas ... must ordinarily be made in the first instance to the lower court, except where a prior order under this chapter has been entered in the matter by the appellate court or a judge thereof.
 Under these rules, the trial court has the authority to dissolve the supersedeas while the appeal is still pending so long as no appellate court judge has entered an order under Chapter 17. Here, no such order was entered.
 
 
 [5]
 The Trustee has the burden of proving that a transfer is avoidable under Section 547(b). 11 U.S.C. Sec. 547(g). The Trustee had the burden of proving that Irvan satisfied the requirements of Rule 1731. It failed to do so
 
 
 [6]
 The Trustee's attempt to establish that Irvan had a supersedeas during the pendency of Irvan's supreme court appeal also fails because, even if we were to conclude that the CD retained by the Prothonotary constituted a "filing with the clerk of the lower court," it would not have been in the appropriate amount. Rule 1731 requires that, unless otherwise ordered, the amount of security be 120% of the amount found due by the lower court. Here, the amount found due was the $190,144.52 awarded in the June 11 order; 120% of $190,144.52 is 228,173.42; the amount of the CD retained by the Prothonotary was 215,941.12
 
 
 [7]
 Rule 3111(c) provides:
 Service of the writ upon the garnishee shall also subject him to the mandate and injunctive orders of the writ restraining him from paying any debt to or for the account of the defendant and from delivering any property of the defendant which may be attached under these rules to anyone except the sheriff or otherwise disposing thereof until further order of the court or discontinuance or termination of the attachment.
 
 
 [8]
 11 U.S.C. Sec. 547(e)(2)(A)
 
 
 [9]
 11 U.S.C. Sec. 547(b)(4)(A)
 
 
 [10]
 The partial assignees challenge the soundness of the Gordon case; however, we are bound to apply the Pennsylvania law as enunciated by the Pennsylvania Supreme Court. Craig v. Lake Asbestos of Quebec, LTD, 843 F.2d 145, 149 (3d Cir.1988)